676 F.2d 63
 110 L.R.R.M. (BNA) 2156, 93 Lab.Cas. P 13,444
 JAMESWAY CORPORATION, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
DISTRICT 65, INTERNATIONAL UNION, UNITED AUTOMOBILE,
AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF
AMERICA, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Jamesway Corporation, Intervenor.
 Nos. 80-2245, 81-1319.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 30, 1981.
Decided March 31, 1982.
 
 Franklin H. Goldberger, Novak & Goldberger, Schenectady, N.Y., Peter G. Nash (argued), Michael J. Bartlett, Ogletree, Deakins, Nash, Smoak & Stewart, Washington, D.C., for Jamesway Corp.
 William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Richard B. Bader, Judith A. Dowd, Carol De Deo (argued), Attys., N.L.R.B., Washington, D.C., for respondent.
 Ira Jay Katz, Philadelphia, Pa., Jonathan H. Siegel, Washington, D.C., for District 65.
 Before ADAMS, ROSENN and SLOVITER, Circuit Judges.
 OPINION OF THE COURT
 ROSENN, Circuit Judge.
 
 
 1
 These cases present two petitions for review and cross-applications for enforcement of an order of the National Labor Relations Board (Board) finding Jamesway Corporation (Jamesway or Store) to have violated section 8(a)(1) and (5) of the National Labor Relations Act (Act), 29 U.S.C. § 158(a)(1) & (5) (1976), by refusing to bargain with District 65, UAW (Union). In No. 80-2245, Jamesway filed a petition under 29 U.S.C. § 160(f) (1976) for review of the Board's order that Jamesway cease and desist in its violations and recognize and bargain with the Union upon request. Jamesway challenges the validity of the representation election and the legality of the Union's certification. Because Congress has not provided for direct review of Board representation proceedings, Jamesway was compelled to expose itself to the unfair labor practice charges in order to obtain judicial review of the representation proceedings, review which this court appropriately should now provide. See Pittsburgh Plate Glass Co. v. NLRB, 313 U.S. 146, 61 S.Ct. 908, 85 L.Ed. 1251 (1941); Anchor Inns, Inc. v. NLRB, 644 F.2d 292 (3d Cir. 1981); NLRB v. Sun Drug Co., 359 F.2d 408 (3d Cir. 1966). The Board has cross-applied for enforcement of its order under 29 U.S.C. § 160(e) (1976). In No. 81-1319, the Union has petitioned this court to set aside that part of the Board's order denying the special relief sought by the Union. The Board has also cross-applied for enforcement of its order in this action. Jamesway's petition for review will be granted; the Board's application for enforcement and the Union's petition to modify the Board's order will be denied.
 
 I.
 
 2
 Jamesway, a New York corporation, operates a department store in Hammonton, New Jersey. On April 2, 1979, the Union filed a representation petition seeking certification as the bargaining representative of the Store's employees.[1] The Regional Director (RD) determined that the appropriate bargaining unit included:
 
 
 3
 All full-time and regular part-time employees, including leased department employees, office clerical employees, department heads, stockroom employees, head cashier, C.I.E. employees and TWX operator at the Employer's store # 32 Hammonton, New Jersey facility, but excluding management trainees, casual and seasonal employees, security employees, leased department managers, head receiver, guards and supervisors within the meaning of the Act and First Federal Savings and Loan Association employees.
 
 
 4
 Jamesway contested the inclusion in the unit of three employees: the store's head cashier and two students employed under the auspices of New Jersey's Cooperative Industrial Education Program.[2] The Board refused to review Jamesway's pre-election objections to the RD's unit determination, concluding that no substantial issues warranting review had been raised.
 
 
 5
 The election was held on June 22. The initial tally of ballots revealed 28 votes for the Union, 29 against, and 6 challenged ballots. Jamesway filed timely objections to the election and to conduct of the Union which the Store maintained improperly affected the election's outcome. Jamesway raised several grounds to have the election set aside.[3] Consideration of one of these, namely Jamesway's claim that campaign literature circulated by the Union on the eve of the election was so deceptive as to impermissibly interfere with the election, is sufficient to determine the disposition of this case.
 
 
 6
 The RD conducted an administrative investigation of the challenges to the ballots and the objections to the election-related conduct. See generally 29 C.F.R. § 102.69 (1981). On October 26, 1979, he issued a Supplemental Decision on Challenged Ballots and Objections to Election in which he overruled four of the six challenges and all of Jamesway's objections. Jamesway filed a request for review of that decision, contending that the RD erred in overruling the Store's objections, a request that the Board denied. On January 4, 1980, the RD issued a Revised Tally of Ballots which showed 32 votes for the Union and 29 against the Union, with 2 ballots challenged by the Union remaining uncounted, the challenges unresolved, because the votes were not determinative of the outcome of the election. The RD certified the Union as the exclusive bargaining agent of the Store's employees on January 10.
 
 
 7
 Jamesway refused to bargain in order to contest the certification, and on May 12, 1980, the RD issued a complaint charging Jamesway with engaging in unfair labor practices within the meaning of section 8(a)(1) and (5) of the Act. The Board ultimately issued its Decision and Order on August 27, 1981. It refused to consider Jamesway's challenges to the certification and ordered Jamesway to bargain with the Union.
 
 II.
 
 8
 As an initial matter we must determine the appropriate standard of judicial review of the Board's opinion and order. Some confusion appears to have developed regarding selection of the appropriate standard for reviewing the Board's determinations regarding the effect of alleged misconduct on the fairness of an election. Generally, when the Board petitions for enforcement of a bargaining order or a party challenges a Board determination that he engaged in an unfair labor practice, a reviewing court is bound to accept the Board's factual findings "if supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e) & (f), see Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); E. L. Wiegand Division, Emerson Electric Co. v. NLRB, 650 F.2d 463, 468 (3d Cir. 1981); Hedstrom Co. v. NLRB, 629 F.2d 305, 313-14 (3d Cir. 1980) (en banc), cert. denied, 450 U.S. 996, 101 S.Ct. 1699, 68 L.Ed.2d 196 (1981). The degree of review authorized under the substantial evidence test has been likened by the Supreme Court to the judgment that a trial judge exercises on whether or not there is sufficient evidence to submit the case to the jury:
 
 
 9
 (Substantial evidence) "must do more than create a suspicion of the existence of the fact to be established.... it must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusions sought to be drawn from it is one of fact for the jury."
 
 
 10
 Universal Camera Corp. v. NLRB, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (quoting NLRB v. Columbian Enameling & Stamping Co., 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660 (1939). Thus, " '(s)ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Universal Camera Corp., supra, 340 U.S. at 477, 71 S.Ct. at 459 (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938). Although under the substantial evidence test a court is not free to substitute its view for that of the Board merely because it would have reached a different conclusion had it considered the question initially, Universal Camera Corp., supra, 340 U.S. at 488, 71 S.Ct. at 464, "a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." Id.
 
 
 11
 The Board argues, however, that a more deferential standard of review governs when a court is called upon to review a decision of the Board regarding the conduct of an election. In such circumstance, the Board maintains, the proper standard addresses "whether the Board acted arbitrarily in the exercise of its discretion." NLRB v. Pinkerton's, Inc., 621 F.2d 1322, 1324 (6th Cir. 1980); see NLRB v. A. J. Tower Co., 329 U.S. 324, 330, 67 S.Ct. 324, 327, 91 L.Ed. 322 (1946). Accordingly, in the instant case the Board urges that the proper standard for reviewing its actions in conducting and certifying the election is whether the Board's actions were within its wide range of discretion.[4]
 
 
 12
 The Board in its attempt to limit the power of review exercised by this court over the Board's determinations regarding the conduct of elections confuses the standard of review a court should use to examine the propriety of election procedures and policies established by the Board with the standard appropriate for review of the Board's application of those procedures and policies to specific elections. That confusion is understandable, since our decisions have not carefully articulated the distinction. Nonetheless, the substantial evidence standard remains the proper one under which Board determinations regarding the impact of alleged misconduct on the fairness of an election must be judged.
 
 
 13
 The source of the abuse of discretion standard which the Board would have us apply is NLRB v. A. J. Tower Co., 329 U.S. 324, 67 S.Ct. 324, 91 L.Ed. 322 (1946). A. J. Tower Co. involved a challenge to a decision of the NLRB to apply strictly its rule that any challenges to a voter's eligibility have to be made before the election is held. In noting the "wide discretion" enjoyed by the Board "in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees," 329 U.S. at 330, 67 S.Ct. at 327, the Court was simply acknowledging the deference to be accorded the Board in promulgating rules and regulations which implement its statutorily created supervisory role. The Court was not called upon to review whether a particular challenge had been timely filed, a question of fact accepted by all the parties, but rather the validity of the Board's uniform policy of prohibiting post-election challenges as a way of preventing election fraud. And there is no indication that the Court intended to displace the substantial evidence standard of review which under 29 U.S.C. § 160(e) & (f) is to be applied by courts of appeals to the Board's findings of fact. Thus, A. J. Tower Co., accords the NLRB wide discretion in formulating election procedures; it does not thereby limit court of appeals review of Board determinations concerning election conduct to the more restrictive abuse of discretion standard.
 
 
 14
 Although A. J. Tower Co. dealt only with the proper standard of review of Board procedures and policies, judicial decisions reviewing the Board's determinations as to whether those procedures and policies had been respected in a particular case have made reference to the A. J. Tower Co. standard even as they have applied the substantial evidence standard. For example, in NLRB v. El-Ge Potato Chip Co., 427 F.2d 903 (3d Cir. 1970), cert. denied, 401 U.S. 909, 91 S.Ct. 869, 27 L.Ed.2d 807 (1971), we noted, relying on NLRB v. A. J. Tower Co., supra, that "(i)t was long ago settled that the Board is entrusted with a 'wide degree of discretion' in establishing and enforcing the procedure and safeguards necessary to insure the fair and free choice by employees of their bargaining representatives." 427 F.2d at 906 (footnote omitted). We concluded nonetheless that the question at issue was whether "the Board's finding that the election was fairly conducted is supported by substantial evidence in the record considered as a whole." Id. (footnote omitted) (emphasis added.)[5] Accord, NLRB v. Pinkerton's, Inc., 621 F.2d 1322, 1324 (6th Cir. 1980); NLRB v. Golden Age Beverage Co., 415 F.2d 26, 29 (5th Cir. 1969).[6]
 
 
 15
 We have also applied the substantial evidence standard of review to Board determinations regarding the impact of alleged misconduct on an election without reference to A. J. Tower Co. Thus in Zeigler Refuse Collectors, Inc. v. NLRB, 639 F.2d 1000, 1005 (3d Cir. 1981), we indicated that "(t)he Board must examine the record, determine the weight to be accorded each factor, and applying its experience, arrive at a final, articulated decision supported by substantial evidence." We also appear to have applied the substantial evidence test sub silentio. In NLRB v. Campbell Products Department, 623 F.2d 876, 879 (3d Cir. 1980), we indicated that "(t)he Board has wide discretion in evaluating the circumstances surrounding an election and determining whether these circumstances allowed a free and fair choice by the voters." The "wide discretion," however, referred to the appropriateness of the Board's policy of distinguishing "between electioneering by an agent or representative of a party to an election, on which the Board takes a strict view, and electioneering by a mere rank and file employee, of which it is more tolerant." Id. (citations omitted). Having approved, under an abuse of discretion standard, the Board's rule that electioneering by parties should be less tolerated than electioneering by nonparties in order to safeguard the election process, we went on to conclude that the Board's "distinction amply supports the Board's conclusion that the electioneering in the instant case, which was undertaken by a mere employee, did not warrant setting aside the election." Id.
 
 
 16
 In only one case have we actually applied what we termed an "abuse of discretion" standard to our review of election challenges, see Monmouth Medical Center v. NLRB, 604 F.2d 820, 821 (3d Cir. 1979).[7] Yet even in that case, we noted that "the Board has 'wide discretion' in establishing the procedures and safeguards for conducting representation elections," id. at 825 (emphasis added), and went on to observe that "(i)n reviewing a Board decision, we may not 'abdicate' our responsibility to assure 'that the Board keeps within reasonable grounds.' " Id. (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 490, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951)). Assuring the reasonableness of the Board's determinations is precisely what is required under the substantial evidence test, which we now reaffirm is to be applied to Board determinations regarding the effect of alleged misconduct on an election. In determining whether a particular incident so disrupted an election as to warrant setting the election aside, a court must satisfy itself that the Board's determination regarding the impact of the incident at issue is supported by substantial evidence on the record considered as a whole.
 
 III.
 
 17
 One of Jamesway's principal objections is directed to the circulation of a campaign handbill. On the eve of the election, several members of the Union's organizing committee presented Jamesway with a document which read:
 
 
 18
 We, the District 65 organizing committee would like a guarantee in writing that the Company will not lay-off or reduce any of the work force of Jamesway Store # 32 after the election or in the future.
 
 District 65 Organizing Committee
 
 19
 When Jamesway refused to sign it, the members of the committee distributed copies of the document, both that same evening and the morning of the election, marked with a distinctive notation:
 
 
 20
 Mr. Madison & Mr. Christo Refused to signed (sic) this in order to protect the New Worker Hired in the Last 3 or 4 Mo.
 
 
 21
 While distributing the handbill, one committee member told an employee that the Store's refusal to sign the "guarantee" demonstrated that the new employees would be laid off. Moreover, as a result of the handbill, several newly hired employees expressed concern that they would lose their jobs. Jamesway objected that the last minute circulation of the handbill coerced and intimidated employees into voting for the Union. Although the RD found that the timing of the handbill's distribution precluded the Store from effectively responding, he concluded that the handbill was unobjectionable because it was literally true, i.e. Jamesway had in fact refused to sign the document. The RD therefore overruled Jamesway's objections.
 
 
 22
 The Board and the courts have evolved criteria for evaluating whether misstatements made prior to an election warrant setting the election aside. As this court has noted, the Board's position on deceptive campaign statements is that although a certain degree of hyperbole, intemperance, and inaccuracy is tolerated in campaign propaganda, an election will be set aside if three conditions are satisfied:
 
 
 23
 A material fact has been misrepresented; opportunity for reply has been lacking; and the misrepresentation has had an impact on the free choice of the employee.
 
 
 24
 Aircraft Radio Corp. v. NLRB, 519 F.2d 590, 593 (3d Cir. 1975) (citing Linn v. United Plant Guard Workers, Local 114, 383 U.S. 53, 60, 86 S.Ct. 657, 661, 15 L.Ed.2d 582 (1966); Hollywood Ceramics Co., 140 N.L.R.B. 221, 224 (1962) (cited with approval in Linn v. United Plant Guard Workers, supra).[8]
 
 
 25
 The RD found, and the Board now argues before this court, that because the statement which appeared on the handbill was literally true-Jamesway's management did refuse to promise on the eve of the election that it would not lay off workers-the necessary predicate for a violation, namely the misstatement of a material fact, is lacking. The Board's position misapprehends the problem posed by the Union's handbill. For the message that was plainly implicit in the handbill, and indeed in some cases orally made explicit, was that recently hired employees risked the loss of their jobs unless the Union were voted in. The juxtaposition of the unsigned promise not to reduce Jamesway's workforce and the Union's skewed construction of that refusal for "the new worker hired in the last 3 or 4 mo." could not be otherwise understood. In effect, the Board asks us to hold that the literal truth of the Union's written commentary on the unsigned document immunizes the handbill's overarching message from judicial scrutiny.[9] We decline to take so rigid an approach.
 
 
 26
 The Board advances two additional arguments in support of its position that the court should not find the handbill sufficiently deceptive to establish a misrepresentation under Aircraft Radio Corp. First, relying on Hollywood Ceramics Co., 140 N.L.R.B. 221 (1962), it argues that even if the handbill may have been subject to the interpretation advanced by Jamesway, the mere fact that a message is "subject to different interpretations will not suffice to establish such misrepresentation as would lead (the Board) to set (an) election aside." Id. at 224 (footnote omitted). By its plain language, however, Hollywood Ceramics establishes that it is messages that are ambiguous because "inartistically or vaguely worded" that may withstand a challenge because subject to more than one interpretation. As noted above, the comment appended to Jamesway's unsigned promise was neither inartistic nor vague; it was precise and pointed.
 
 
 27
 Finally, the Board suggests that in any event the Union was under no obligation to correct misunderstandings that may have arisen from the handbill. For this last proposition the Board relies on NLRB v. Pinkerton's, Inc., 621 F.2d 1322 (6th Cir. 1980). That reliance is unavailing. The Pinkerton court did note, as quoted to us by the Board, that in that case
 
 
 28
 The employer admitted the statements ... were literally true, but claimed the statements were misleading for failure to give more facts or put the statements in context. The Union does not have to give more information which would make the statements unmistakably clear.
 
 
 29
 Id. at 1327. The Pinkerton court continued, however, "As the employer had time to respond to the statements in the earlier letters, the Regional Director properly held they did not warrant setting aside the election." Id. Moreover, because the employer did not have time to respond to another objectionable union statement regarding the company's profits, the court ultimately refused to uphold the election. Id. at 1329.[10]
 
 
 30
 In sum, we conclude that the Union's handbill falsely created the impression that unless the Union were elected, newly hired workers faced the risk of layoff.
 
 
 31
 It is not enough that campaign literature has misrepresented certain facts to justify setting aside an election. Rather, the misrepresentation must have related to a material fact and must have had an impact on the free choice of the employee. Aircraft Radio Corp. v. NLRB, supra.
 
 
 32
 In determining what kinds of misrepresentations are sufficiently material to warrant setting aside an election, courts have been particularly willing to intervene and overrule Board certification of an election when the misrepresentation concerned matters which touch on the heart of the collective bargaining process: whether employees will fare better with or without the union as their bargaining representative. Accordingly, courts have not hesitated to deny enforcement of a bargaining order where prior to an election the Union significantly misrepresented its ability to improve the earning power of workers if they voted in the Union, see, e.g., J. I. Case Co. v. NLRB, 555 F.2d 202 (8th Cir. 1977); Howard Plating Industries v. NLRB, 635 F.2d 532 (6th Cir. 1980) (per curiam); Cross Baking Co. v. NLRB, 453 F.2d 1346 (1st Cir. 1971), or the profitability of the company from whom wage demands are extracted, see, e.g., Vitek Electronics, Inc. v. NLRB, 653 F.2d 785 (3d Cir. 1981); Argus Optics v. NLRB, 515 F.2d 939 (6th Cir. 1975).
 
 
 33
 Another factor, only sometimes alluded to by the decisions, which we believe properly animates a court's inquiry into the impact of electioneering misrepresentations on an election is the closeness of the balloting results. See Cross Baking Co. v. NLRB, 453 F.2d 1346, 1350 (1st Cir. 1971). The closer the outcome, the less solicitous a court should be of campaign misrepresentations. Compare Cross Baking Co. v. NLRB, 453 F.2d 1346 (6th Cir. 1971), and Aircraft Radio Corp. v. NLRB, 519 F.2d 590 (3d Cir. 1975) (close vote-enforcement denied), with NLRB v. Sumter Plywood Corp., 535 F.2d 917 (5th Cir. 1976), cert. denied, 429 U.S. 1092, 97 S.Ct. 1105, 51 L.Ed.2d 538 (1977), and NLRB v. Sauk Valley Manufacturing Co., 486 F.2d 1127 (9th Cir. 1973) (union won by large margin-enforcement granted).[11]
 
 
 34
 The last factor which the Board, and on review this court, considers in evaluating the effect of deceptive campaign statements on an election is the opportunity of the party to respond to the misrepresentation. Although an opportunity to respond does not alone prevent misleading campaign literature or statements from invalidating an election, see Aircraft Radio Corp. v. NLRB, 519 F.2d 590 (3d Cir. 1975), usually if a party is afforded ample time to effectively respond to misrepresentations, the misrepresentations will not constitute grounds to set aside an election. Warner Press, Inc. v. NLRB, 525 F.2d 190, 195 (7th Cir. 1975), cert. denied, 424 U.S. 943, 96 S.Ct. 1410, 47 L.Ed.2d 348 (1976).
 
 
 35
 Evaluating the circumstances of this case against the factors enumerated above, we conclude that there does not exist substantial evidence on the record to support the Board's conclusion that circulation of the handbill did not warrant setting aside the election. We have already concluded that despite the veracity of the handbill, its plain message misrepresented the effect on recently hired employees of voting down the Union. The issue raised in the handbill-the job security of newly hired employees-concerns, as does the question of wages, matters at the heart of an employee's decision whether to support a union. The handbill's message was not simply a general representation that the Union could better protect the job security of employees. Cf. NLRB v. Sauk Valley Manufacturing Co., 486 F.2d 1127 (9th Cir. 1973). Rather, the handbill indicated that Jamesway's specific failure to guarantee the job security of its employees in writing-a promise Jamesway could not lawfully have made on the eve of the election, supra note 9-demonstrated that the jobs of newly hired employees were in peril without union protection. Moreover, the balloting in this case was extremely close.[12] Finally, the RD found that Jamesway did not have time to respond effectively to the handbill's distribution. As a result, "employees not otherwise disposed to support the union could well (have) conclude(d) that a union would be their only source of protection, thus interfering substantially with their free and untrammeled choice." Schneider Mills, Inc. v. NLRB, 390 F.2d 375, 379 (4th Cir. 1968) (en banc).
 
 
 36
 None of the decisions cited by the Board in which elections were upheld against challenges based on pre-election misrepresentations involved situations where all of the elements of Aircraft Radio Corp. were satisfied. In some the alleged misstatements were not found to be material because they were merely vague puffery, see NLRB v. Sumter Plywood Corp., 535 F.2d 917 (5th Cir. 1976), cert. denied, 429 U.S. 1029, 97 S.Ct. 1105, 51 L.Ed.2d 538 (1977); NLRB v. Sauk Valley Manufacturing Co., 486 F.2d 1127 (9th Cir. 1973), or involved a subject about which the employees had independent knowledge, see Harlan # 4 Coal Co. v. NLRB, 490 F.2d 117 (6th Cir. 1974), cert. denied, 416 U.S. 986, 94 S.Ct. 2390, 40 L.Ed.2d 763 (1974). In some the company had had more than ample time to respond. See NLRB v. Sumter Plywood Corp., 535 F.2d 917 (5th Cir. 1976), cert. denied, 429 U.S. 1092, 97 S.Ct. 1105, 51 L.Ed.2d 538 (1977); Warner Press, Inc. v. NLRB, 525 F.2d 190 (7th Cir. 1975), cert. denied, 424 U.S. 943, 96 S.Ct. 1410, 47 L.Ed.2d 348 (1976). Not surprisingly, in all of the cases cited above save one the election results were not close, and in that one, Warner Press, Inc. v. NLRB, supra, the balloting results are simply not reported.
 
 
 37
 We hold that in the present case the misrepresentation contained in the Union handbill, offered without time for rebuttal, with a demonstrated impact on so close an election, requires that the election be set aside. The election lacked "the safeguards necessary 'to insure the fair and free choice of bargaining representatives.' " Aircraft Radio Corp. v. NLRB, 519 F.2d 590, 594 (3d Cir. 1975).
 
 
 38
 Because we have concluded on the record before us that the misrepresentation had a material impact on the election, our proper course is simply to set aside the election rather than remand for further proceedings, as the concurring and dissenting opinion proposes. Courts have not hesitated to order a new election in the face of pre-election misconduct when, as in the present case, the facts underlying the incidents are undisputed and the court has concluded that the activity in question is impermissible. See NLRB v. Carroll Contracting & Ready-Mix, Inc., 636 F.2d 111 (5th Cir. 1981) (per curiam). This willingness to order a new election rather than remand to the Board for further proceedings is exemplified by Monmouth Medical Center v. NLRB, 604 F.2d 820 (3d Cir. 1979), where we reviewed misleading campaign literature, concluded that it constituted "impermissible interference in the election," id. at 829, and denied the Board's petition for enforcement of its bargaining order without remanding the case for a hearing. Id. at 830. Accord NLRB v. Nixon Gear, Inc., 649 F.2d 906 (2d Cir. 1981).
 
 
 39
 Although this court has sometimes remanded cases involving objections based on pre-election misconduct, in almost every instance the remand was necessitated by the insufficiency of the record. Thus in Wells Fargo Guard Services v. NLRB, 659 F.2d 363 (3d Cir. 1981), where the existence of the misrepresentation turned on whether or not the union's former president, Martin, had remained in control of the union, we remanded to determine whether his purported resignation was a sham. As we noted, "(i)f Mr. Martin in fact continued to guide the (union), his purported resignation was a misrepresentation, a substantial departure from the truth, and might well have had a significant impact on the election, which was close." Id. at 373. We did not remand for the purpose of determining the materiality and impact of the alleged misrepresentation, but instead concluded based on the record before us that "if Mr. Martin in fact remained in control of the (union) after his purported departure, the ... election should be set aside." Id. See also Season-All Industries, Inc. v. NLRB, 654 F.2d 932 (3d Cir. 1981) (remand to determine whether person was union agent and nature of activity he engaged in); Anchor Inns, Inc. v. NLRB, 644 F.2d 292 (3d Cir. 1981) (same). In other cases, remand has been necessary because the nature of the misleading statements made it unclear whether they had affected the election. Thus in Vitek Electronics, Inc. v. NLRB, 653 F.2d 785 (3d Cir. 1981), we remanded to the Board because the alleged misrepresentations were ambiguous and may not have been misunderstood by employees. And in NLRB v. Silverman's Men's Wear, Inc., 656 F.2d 53 (3d Cir. 1981), where the pre-election conduct involved not a misrepresentation but a religious slur, we remanded so that it could be established whether the slur created an atmosphere that would have inhibited voting free from the pernicious effect of appeals to prejudice, a question that could not be answered on the record before us.
 
 
 40
 In the present case we have concluded that the handbill's message was clear, inaccurate, and addressed a question of substantial importance to employees considering whether they wanted to be represented by the Union. In addition, the Union's victory was very narrow. Remand at this stage is therefore neither necessary nor appropriate.
 
 IV.
 
 41
 Because we hold that a new election must be held, we need not address each of Jamesway's remaining objections to the conduct of the election.[13] Nor must we consider the Union's petition to modify the Board's order. Accordingly, Jamesway's petition for review will be granted. The Board's cross-application for enforcement of its order will be denied.
 
 
 42
 SLOVITER, Circuit Judge, concurring in part and dissenting in part.
 
 
 43
 I concur with the majority in denying enforcement of the Board's order. I disagree with the standard of review adopted by the majority and with the majority's decision to set aside the election rather than to remand for an evidentiary hearing as to the materiality and impact of the misrepresentation.
 
 1. Standard of Review
 
 44
 The majority distinguishes between the "substantial evidence" standard and the more deferential "abuse of discretion" standard used by the courts of appeals in reviewing Board decisions, and decides that the less deferential "substantial evidence" standard is applicable in this case.
 
 
 45
 The wide discretion accorded to the Board in election matters has its genesis in NLRB v. A. J. Tower Co., 329 U.S. 324, 330, 67 S.Ct. 324, 327, 91 L.Ed. 322 (1946), where the Supreme Court said, "Congress has entrusted the Board with a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees." The majority appears to concede that A. J. Tower Co. requires that an abuse of discretion standard be utilized when the court is reviewing election procedures established by the Board, but it draws a distinction between review of "election procedures and policies established by the Board" and review of determinations regarding the "application of those procedures and policies to specific elections." Typescript op. at 67. Although the majority is correct that the issue in the A. J. Tower Co. case involved Board-established election procedures, there is no suggestion in that opinion that the wide discretion enjoyed by the Board should be limited to that aspect of its election-supervising role, nor have the subsequent cases citing A. J. Tower Co. made the distinction adopted by the majority in this case.
 
 
 46
 The majority suggests that, in reviewing the Board's application of its procedures and policies to charges of election misconduct in a particular case, courts "have made reference to the A. J. Tower Co. standard even as they have applied the substantial evidence standard." Typescript op. at 67. However, the cases relied on for that proposition do not in fact support it. On the contrary, the three cases cited by the majority stand at most for the proposition that instead of applying either the "abuse of discretion" or the "substantial evidence" standard, there has been a regrettable amalgamation of the two. Thus, in NLRB v. El-Ge Potato Chip Co., 427 F.2d 903, 906 (3d Cir. 1970), cert. denied, 401 U.S. 909, 91 S.Ct. 869, 27 L.Ed.2d 807 (1971) (citations omitted), we stated:
 
 
 47
 It was long ago settled that the Board is entrusted with a "wide degree of discretion" in establishing and enforcing the procedure and safeguards necessary to insure the fair and free choice by employees of their bargaining representatives. "Considerable weight * * * must therefore be accorded the Board's findings, with judicial review narrowly limited to ascertaining only their reasonableness." Whether this court would reach the same conclusion from the evidence as did the Board is immaterial, as long as the Board's finding that the election was fairly conducted is supported by substantial evidence in the record considered as a whole.
 
 
 48
 After reviewing the entire record, we cannot say that the Board acted unreasonably in concluding that the election was fair and proper.
 
 
 49
 Similarly, in NLRB v. Golden Age Beverage Co., 415 F.2d 26 (5th Cir. 1969), the court referred on numerous occasions to the "wide degree of discretion" which must be accorded to the Board's determination:
 
 
 50
 We must resolve whether the Board, by overruling the Company's objections to the representation election without a hearing, acted within its wide degree of discretion.... (Id. at 28).
 
 
 51
 Certain well established principles guide this inquiry. Most important is the wide discretion Congress has entrusted to the Board in its conduct and supervision of elections.... "Thus, the only question presented to the Courts in an election review is whether the Board has reasonably exercised its discretion." (Id. at 29 (citation omitted) ).
 
 
 52
 (N)o area is more within the expertise of the Board than the proper limits of campaign propaganda and the impact of employer and union statements upon the employees' exercise of free choice. (Id. at 30).
 
 
 53
 The court also, without any suggestion of inconsistency, said:
 
 
 54
 Whether this Court would reach the same conclusion as the Board from the conflicting evidence is immaterial, so long as the Board's finding that the election was fairly conducted is supported by substantial evidence in the record considered as a whole. (Id. at 29).
 
 
 55
 The third case cited by the majority, NLRB v. Pinkerton's, Inc., 621 F.2d 1322 (6th Cir. 1980), also failed to observe the distinction between the two standards. The court stated:
 
 
 56
 Congress has entrusted to the Board considerable discretion in conducting elections and resolving disputes concerning representation. The task for this Court is to determine whether the Board acted arbitrarily in the exercise of its discretion. The Board's findings, if supported by substantial evidence, must be affirmed even though this Court might justifiably reach a different conclusion had it reviewed the case de novo.
 
 
 57
 Id. at 1324 (citations omitted).
 
 
 58
 Contrary to the majority's suggestion that the courts have applied the substantial evidence standard as distinct from the abuse of discretion standard in reviewing Board determinations as to the effect of election conduct, the cases cited by the majority, which involved charges of particular election misconduct not the formulation of general procedures and policies, emphasized the wide discretion enjoyed by the Board in election matters. At most, these cases indicate that the courts often seem to use "abuse of discretion" and "substantial evidence" interchangeably.
 
 
 59
 It may be that given this state of affairs, we are free to decide the issue de novo. We are, however, bound to follow the precedent of this court. Although, as El-Ge Potato Chip indicates, we have not always been meticulous in observing the distinction between the two standards, our recent cases suggest that we have most frequently, although not invariably, applied the abuse of discretion standard to the election conduct issue before us. In Monmouth Medical Center v. NLRB, 604 F.2d 820 (3d Cir. 1979), we employed an abuse of discretion/arbitrariness standard in a case involving charges of Union misconduct. Although we refused to enforce the Board's order that the Company bargain with the Union, we did so on the ground that "the Board's certification decision ... amounted to an abuse of discretion." Id. at 821. See also id. at 823, 825. In NLRB v. Campbell Products Department, 623 F.2d 876, 879 (3d Cir. 1980), we noted that "(t)he Board has wide discretion in evaluating the circumstances surrounding an election and determining whether these circumstances allowed a free and fair choice by the voters." See Anchor Inns, Inc. v. NLRB, 644 F.2d 292, 295-96 (3d Cir. 1981); Wells Fargo Guard Services v. NLRB, 659 F.2d 363, 370 (3d Cir. 1981). But see Zeiglers Refuse Collectors, Inc. v. NLRB, 639 F.2d 1000, 1002, 1005 (3d Cir. 1981).
 
 
 60
 The approach in these cases accords with that generally followed elsewhere. For example, in Melrose-Wakefield Hospital Association, Inc. v. NLRB, 615 F.2d 563, 566-67 (1st Cir. 1980), the court stated:
 
 
 61
 In seeking to overturn the Board's decision overruling the objections, the Hospital faces a heavy burden. The Board has wide discretion in setting standards for the conduct of representation elections, and its rulings on the effect of a particular campaign practice will be set aside only if they are an abuse of discretion.
 
 
 62
 ....
 
 
 63
 The Board has adhered to different standards over the years for evaluating what range of misstatements will so mar an election that its results must be set aside.... Our task as a reviewing court is not to evaluate the merit of the Board's policy, the development of which is committed to their expertise, but merely to ascertain whether the agency abused its discretion in applying the standard to particular facts.
 
 
 64
 (emphasis added) (citations & footnote omitted). As Professor Gorman has written, "In the great majority of cases, the decision of representation issues will invite the exercise of considerable discretion in the application of vague (or nonexistent) statutory mandates to highly particularized facts." R. Gorman, Labor Law 60 (1976). Professor Gorman included among the categories of issues to which this standard has been applied both "the upsetting of 'laboratory conditions' which are a prerequisite to a valid election" and "the propriety of conduct at election locations." Id.
 
 
 65
 The majority confuses the review of findings as to the occurrence of an unfair labor practice, which are subject to the substantial evidence standard, with the question of the impact of election misconduct. Typescript op. at 67-68 n.5. As our decision in Monmouth Medical Center illustrates, we have accorded the Board greater deference in the latter area.
 
 
 66
 The most careful, and for me the correct, allocation between the issues governed by the "wide discretion" and "substantial evidence" standards was made by Judge Pell. In Peerless of America, Inc. v. NLRB, 576 F.2d 119, 122 (7th Cir. 1978) (citations omitted), he wrote, "We note that the Board has been entrusted with broad discretion in determining the nature and extent of pre-election campaign propaganda that will be allowed, and thus considerable deference must be given to the Board's expertise in this area. We will not upset the Board's decision unless we find that it abused its discretion; however, the Board's findings of fact are conclusive if supported by substantial evidence."
 
 
 67
 There are indeed practical reasons for according wide deference to the Board's election decisions, even when the issue is election misconduct. As the court stated in NLRB v. Nixon Gear, Inc., 649 F.2d 906, 910 (2d Cir. 1981) (citations omitted), a case raising the issue of election misconduct: " 'The conduct of representation elections is the very archetype of a purely administrative function, with no quasi about it, concerning which courts should not interfere save for the most glaring discrimination or abuse,' lest appellate interference threaten the essential functioning of a system that governs, according to well-settled standards, the conduct of nearly 10,000 elections annually."
 
 
 68
 I believe the attempt by the majority to clarify the confusion which has surrounded the applicable standard of review in election cases is commendable; I believe its selection of the applicable standard in this case is erroneous.
 
 2. Necessity of a Hearing
 
 69
 I agree with the majority that distribution of the handbill under the circumstances in this case could constitute a misrepresentation, notwithstanding the literal truth of the statement. I believe, however, that the appropriate course would be to remand to the Board for an evidentiary hearing as to the materiality and impact of the misrepresentation.
 
 
 70
 As the majority notes, an election will not be set aside unless the misrepresentation related to a material fact and had a significant impact. In this case, there has been no hearing on either the materiality or the impact of the misrepresentation. The issue was not addressed by the Regional Director because of his erroneous view that the statements were shielded by their literal truth. When the issue was presented to the Board in the context of the unfair labor practice charge, it refused to hold a hearing. Thus, those on whom we would ordinarily rely to make the relevant factual findings have not done so.
 
 
 71
 There are cases in which the courts have held it appropriate to set aside an election although no hearing was held. See, e.g., NLRB v. Nixon Gear, Inc., 649 F.2d 906 (2d Cir. 1981) (company argued it had been prejudiced by the delay); NLRB v. Carroll Contracting & Ready-Mix, Inc., 636 F.2d 111 (5th Cir. 1981). See also Monmouth Medical Center v. NLRB, 604 F.2d 820 (3d Cir. 1979) (election set aside without discussion of whether hearing should be ordered or whether a hearing had been requested). However, in most of the recent cases in which this court has denied enforcement in unfair labor practice proceedings involving underlying election challenges, we have remanded for a hearing. See, e.g., Wells Fargo Guard Services v. NLRB, 659 F.2d 363 (3d Cir. 1981); Season-All Industries, Inc. v. NLRB, 654 F.2d 932 (3d Cir. 1981); Vitek Electronics, Inc. v. NLRB, 653 F.2d 785 (3d Cir. 1981); Anchor Inns, Inc. v. NLRB, 644 F.2d 292 (3d Cir. 1981).
 
 
 72
 The clearest rationale for remanding to the Board for a hearing in this case appears in NLRB v. Silverman's Men's Wear, 656 F.2d 53 (3d Cir. 1981) (per curiam), in which both judges constituting the majority here were also on the panel. In that case, the Company alleged that a union official had made an anti-Semitic slur against a company official. The court concluded as a matter of law that the remark was illegitimate, but remanded for a hearing to "determine the extent of its probable impact on the election." Id. at 58. The court stated:
 
 
 73
 We conclude that under the law announced in Sewell (Manufacturing Co., 138 N.L.R.B. 66 (1962) ), the Company's allegations, if true, would warrant a new election, assuming that the totality of circumstances surrounding Baird's remarks evinced an atmosphere in which those remarks may reasonably be expected to have had a significant impact on the employees' free exercise of choice. These factors should properly be explored at a hearing, because they constitute substantial and material factual issues necessarily arising out of the allegations made in the Company's objection. See Anchor Inns, Inc. v. NLRB, 644 F.2d at 296. Having received the Company's allegations, it was only through a hearing that the Regional Director could determine that such circumstances were not present, for only through a hearing could the union have borne its burden of proving that the utterance was harmless. Such a course-followed already by at least some Regional Directors-is necessary if elections are to be kept free, as they should be, from appeals to racial or religious prejudice.
 
 
 74
 Id. at 60. The election misconduct in Silverman's would appear to be more patently improper than that involved here. I believe, therefore, that we should follow the course utilized there, and remand for a hearing to give the Union the opportunity to show that the misrepresentation in this case did not have the forbidden impact.[1]
 
 
 
 [1]
 The petition described the bargaining unit which it sought to represent as including "all production, shipping and receiving, janitors, cashiers, office personnel, inventory control, (and) sales" employees at Jamesway Store No. 32. Excluded from the unit were "guards and supervisors under the act."
 
 
 [2]
 The New Jersey Department of Education administers its Cooperative Industrial Education Program, a work-study program for vocational secondary school students, in coordination with various local school boards. The program is designed to educate high school students in particular occupations and provide them with vocational skills prior to graduation
 
 
 [3]
 In addition to objecting to the last-minute circulation of a handbill, see infra, the employer also contends that:
 
 
 [1]
 The Board improperly included in the bargaining unit the head cashier and two students working under New Jersey's Cooperative Industrial Education Program, all of whom, it argues, were ineligible to vote
 
 
 [2]
 A union committeeman and other union adherents engaged in threats of physical violence and intimidation of employees in the bargaining unit
 
 
 [3]
 Employees were threatened by a union committeeman that if they did not support the Union prior to the election their initiation fees would be higher when they joined afterward
 
 
 [4]
 The union organizing committee engaged in polling misconduct which interfered with a free and fair election
 
 
 [4]
 The abuse of discretion standard of review which the Board urges on us entails a greater degree of judicial deference to agency action than does substantial evidence review. Under the latter standard, a reviewing court must assure itself that substantial evidence supports an agency's findings. See supra majority opinion, typescript at 66. In contrast, "(a)buse of discretion may be found 'only if there is no evidence to support the decision or if the decision is based on an improper understanding of the law.' " Jaimez-Revolla v. Bell, 598 F.2d 243, 246 (D.C.Cir.1979) (per curiam) (quoting Song Jook Suh v. Rosenberg, 437 F.2d 1098, 1102 (9th Cir. 1971)
 
 
 [5]
 The concurring and dissenting opinion approves of a narrower formulation of this standard of review, which appears to give the Board "broad discretion" in determining the effect of pre-election activity on an election and limits our "substantial evidence" review to the narrower category of "findings of facts," which I take to mean the narrative facts on which the Board's determination is based. To the extent that this formulation of the standard insulates Board determinations of the effect of alleged misconduct on an election from substantial evidence review it is contrary to the law of this circuit and unduly limits the review function of this court
 Our decisions consistently demonstrate that our review of "factual findings" in an unfair labor practice case under 29 U.S.C. § 160(e) & (f) is not limited to ascertaining whether the facts were as found by the Board, but extends to review of the correctness of the Board's determination whether those facts established that an unfair labor practice had been committed. See, e.g., Hedstrom Co. v. NLRB, 629 F.2d 305, 313-19 (3d Cir. 1980) (en banc), cert. denied, 450 U.S. 995, 101 S.Ct. 1699, 68 L.Ed.2d 196 (1981); Wheeling-Pittsburgh Steel Corp. v. NLRB, 618 F.2d 1009, 1016-21 (3d Cir. 1980); Electrical Products Division of Midland-Ross Corp. v. NLRB, 617 F.2d 977, 983 (3d Cir. 1980). That the pre-election conduct at issue here is not the basis for the unfair labor charge, but is rather raised in defense to the charge that Jamesway has failed to bargain with the Union, does not alter the standard of review. 29 U.S.C. § 160(f) specifically subjects to substantial evidence review findings of fact that a petitioner believes demonstrate that no unfair labor practice has been committed. In the context of a challenge to the certification of a union following an election, the Board's determinations that certain conduct did or did not comport with its standards for a fair election are thus made subject to substantial evidence review. NLRB v. El-Ge Potato Chip Co., supra, 427 F.2d at 906.
 
 
 [6]
 The First Circuit, in contrast, employs an abuse of discretion standard in reviewing Board determinations concerning the conduct of elections. See Melrose-Wakefield Hosp. Ass'n v. NLRB, 615 F.2d 563, 566-67 (1st Cir. 1980)
 
 
 [7]
 There are other decisions which loosely refer to the Board's "wide discretion" in conducting elections but do not apply that standard of review to Board determinations regarding the conduct of elections. See Wells Fargo Guard Services v. NLRB, 659 F.2d 363, 370 (3d Cir. 1981) ("The Board has ' "wide discretion" ' in conducting representation elections. However, where, as here, an election is close, 'closer scrutiny of objections may be required of the Board.' ") (footnote and citations omitted); Vitek Electronics, Inc. v. NLRB, 653 F.2d 785, 787 (3d Cir. 1981) ("Our review is essentially a review of the Regional Director's post-election findings and conclusions as adopted by the Board."); Anchor Inns, Inc. v. NLRB, 644 F.2d 292, 295-96 (3d Cir. 1981) ("Courts, sharing only indirectly in the responsibility for monitoring election process, have afforded the Board a 'wide degree of discretion' in the conduct of the election and the attendant proceedings.' ")
 
 
 [8]
 The Board overruled Hollywood Ceramics Co. in favor of a much more deferential posture in Shopping Kart Food Mkt., Inc., 228 N.L.R.B. 1311 (1977), but quickly re-embraced the Hollywood Ceramics standard in General Knit of California, Inc., 239 N.L.R.B. 619 (1978)
 
 
 [9]
 The inequity of refusing to evaluate the effect of the handbill on the imminent election because of its literal truth is heightened because Jamesway could not have signed the document without violating the Act. Not only would signing the agreement have been tantamount to bargaining with the Union in the face of a pending election, such an action would have amounted to a promise of a material benefit made on the eve of an election and thus would have constituted an unfair labor practice
 
 
 [10]
 To the extent that NLRB v. Pinkerton's, Inc., supra, may be read to support the Board's contention that the literal truth of a statement may not be the basis of any misunderstanding, we reject it. Indeed,
 A truth that's told with bad intent Beats all the Lies you can invent.
 W. Blake, "Auguries of Innocence," lines 53 & 54.
 
 
 [11]
 This does not mean of course that misrepresentations warrant denying enforcement of a bargaining order only in close elections. See Schneider Mills, Inc. v. NLRB, 390 F.2d 375 (4th Cir. 1968) (en banc)
 
 
 [12]
 The final tally was 32 to 29. Challenges to two ballots by the Union were not resolved and the ballots not counted because the votes were not determinative of the election
 
 
 [13]
 We are troubled, however, by an incident that Jamesway contends marred the actual balloting, involving alleged electioneering by a union supporter near the polls. Prior to the commencement of balloting, several pro-Union employees wearing Union campaign buttons gathered at the store's "cutting table," located approximately 15-20 feet from the polls along the main aisle of the store, so that employees had to pass them on their way to vote. Jamesway requested that the area near the polls remain clear. Nonetheless, the Union's business agent proceeded to station Mary Straus, a member of the Union organizing committee and apparently the chief employee organizer of the union, at the cutting table, where she remained throughout the balloting. Straus, who was wearing a mass of union buttons, was observed talking about the election and the union at various times throughout the polling period
 Once Straus was stationed by the polls, her presence may well have been sufficiently intrusive to warrant setting aside the election. She was observed speaking with employees in so loud a tone of voice that she could be overheard by employees casting their ballots. Indeed, several employees complained to the Store's manager about her presence. Emblazoned with campaign buttons, Straus was purposely stationed within the line of march to the polls and reinforced the effect of her presence by a continuous stream of chatter with the employees awaiting their turn to vote. The aggregate effect of so intrusive a presence might require setting aside an election in favor of the offending party. See Michem, Inc., 170 N.L.R.B. 362 (1968).
 
 
 [1]
 The majority has chosen not to address the issue of the appropriateness of the unit determination. The Company challenges the inclusion of the head cashier and two students in the unit. See typescript op. at 65 n.3. The inclusion of the students will probably not recur. However, since the majority orders a new election, I assume it approves the determination that the head cashier was appropriately placed in the unit, a determination which I believe is supported by the record in this case